UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| ALBERTO CAMPOS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:09-CR-02 |
| | ) (2:13-CV-95) |
| UNITED STATES OF AMERCIA, | ) |
| | ) |
| Respondent. | ) |

**REPORT AND RECOMMENDATION**

Petitioner, Alberto Campos, has filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 [Doc. 498]. His motion has been referred to the Magistrate Judge for a Report and Recommendation.[1]

Petitioner and seventeen other defendants were indicted for various drug and firearms offenses.[2] Attorney Tim Moore of Federal Defender Services of East Tennessee was appointed to represent Petitioner. On November 24, 2009, Petitioner and the United States entered into a plea agreement under which Petitioner pled guilty to conspiring to distribute or to possess with the intent to distribute 500 or more grams of cocaine, and to possessing a firearm as a convicted felon.[3] He entered his change of plea on December 15, 2009.

The stipulated drug quantity set in the plea agreement[4] yielded a base offense level of 30 under the Guidelines. Because Petitioner possessed a firearm during a drug transaction, his offense level was increased by two levels. It was increased another three levels due to Petitioner's role in the conspiracy. Petitioner's offense level for the firearms offense was 35.

---
[1] Doc. 538
[2] Doc. 168
[3] Doc. 179
[4] Between 3.5 and 5 kilograms of cocaine, plea agreement, ¶ 4(a), Doc. 179

Accordingly, Petitioner's adjusted offense level was 35.[5]

Because Petitioner had prior felony convictions in California for possessing crack cocaine for resale and for threatening a witness or victim,[6] he was classified as a career offender with an offense level of 37.[7] He received a three-level reduction for acceptance of responsibility, yielding a net total offense level of 34.[8]

His status as a career offender raised his criminal history category to VI.[9] His resulting guideline range was 262 to 327 months.[10]

This Court sentenced Petitioner for the drug offense to the bottom of his guideline range, 262 months, and to the statutory maximum for the firearms offense, 120 months, the sentences to run concurrently.[11]

Petitioner's motion is based on what he asserts was his attorney's ineffective representation in four particulars:

   1. for failing to argue that his 1994 drug conviction in California did not qualify as a predicate offense to be used as an enhancement under U.S.S.G. § 4B1.2(b);

   2. for telling him that he would only get a 10-year sentence if he pled guilty;

   3. for failing to obtain records from mental institutions which would have shown that he had been adjudicated legally insane; and

   4. for failing to argue against application of a three-level enhancement for being in a managerial role in the conspiracy.[12]

---

[5] PSR, ¶¶ 62-64, 75
[6] PSR, ¶¶ 98, 100
[7] PSR, ¶ 78
[8] *Id.*
[9] PSR, ¶ 103
[10] PSR, ¶ 126
[11] Judgment, Doc. 465
[12] Doc. 498-1

2

In his reply or traverse to the government's response, Petitioner abandoned claim number two, *viz.*, that his attorney told him he would be sentenced to no more than ten years.[13] However, in what Petitioner describes as a "supplement" to his § 2255 motion, he raises another distinct issue: that his 1994 California drug conviction is invalid because his attorney in that case failed to warn him before he pled *nollo contendere* to that charge that he could be deported from the United States, and since that California conviction is invalid, it cannot serve as a predicate conviction as far as his sentence in this Court is concerned. [Doc. 534].

I.  **LEGAL STANDARDS**

A prisoner in federal custody may file a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255(a), "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

When a § 2255 Petitioner claims he was denied his sixth amendment right to effective assistance of counsel, it is noted that an attorney is presumed to have provided effective assistance, and the Petitioner bears the burden of showing that the attorney did not, *Mason v. Mitchell*, 320 F.3d 604, 616-17 (6th Cir. 2003). Petitioner must prove that specific acts or omissions by his attorney were deficient and that the attorney failed to provide "reasonably effective assistance," *Strickland v. Washington*, 466 U.S. 668, 687 (1987), which is measured by "prevailing professional norms," *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). If Petitioner crosses this evidentiary hurdle, he must then show "a reasonable probability that, but for [the attorney's acts or omissions], the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694.

---

[13] Doc. 501, p. 1

Under Rule 8 of the Rules Governing Section 2255 Proceedings in the United States District Courts, the Court is to determine after a review of the answer and the records in the case whether an evidentiary hearing is required. Rule 4(b) of the Rules permits the District Court to summarily dismiss a § 2255 motion if "it plainly appears from the face of the motion… that the movant is not entitled to relief."

## II. ANALYSIS

### 1. *Did Petitioner's attorney fail to render effective assistance by failing to argue that his 1994 California drug conviction did not qualify as a predicate offense under U.S.S.G. § 4B1.2(b)?*

Petitioner's premise is that there is a conflict between U.S.S.G. § 4B1.2(b) and the California statute under which he was convicted in 1994. He says that the California statute criminalizes the possession of crack cocaine *for sale*, whereas U.S.S.G. § 4B1.2(b) defines a controlled substance offense as an offense under federal or state law that prohibits the "manufacture, import, export, distribution or dispensing of a controlled substance…or the possession of a controlled substance…with intent to manufacture, import, export, distribute, or dispense." He argues that the absence of the words "sale" or "resale" in U.S.S.G. § 4B1.2(b) means that it is possible to violate the California statute under which he was convicted without coming within the foregoing Guideline section's definition of a controlled substance offense.

His argument is spurious. As the government correctly points out in its response, selling drugs necessarily involves a transfer of drugs to another individual, and thus there is a "distribution" as far as U.S.S.G. § 4B1.2(b) is concerned. Similarly, possessing a drug for resale under the California statute is functionally identical to "possession with intent to distribute" under U.S.S.G. § 4B1.2(b).

4

Petitioner's attorney cannot be faulted for failing to make a nonsensical argument. *See*, *e.g.*, *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir. 1986).

2. *Did Petitioner's counsel render ineffective assistance by telling him that he would receive only a 10-year sentence?*

As noted earlier, Petitioner has withdrawn this ground.

3. *Did Petitioner's counsel render ineffective assistance by failing to obtain records from mental institutions to show that Petitioner was legally insane when he pled guilty?*

Petitioner faults his attorney for failing to obtain records which would have shown he "was legally insane when he pled guilty."

Attached to his motion is a copy of a note written by his wife to Attorney Moore in which she says that her husband had been seeing a Dr. Diebolt at the Behavioral Health Center at Tacoma Hospital in Greeneville, Tennessee and that he "takes Haldol for his problem." Mrs. Campos goes on to mention Petitioner's high blood pressure, heart problems, congestive heart failure, and that in her opinion Petitioner's "mental issues" may have contributed to his drug addiction and all the judicial problems he was then experiencing.[14]

Petitioner also attached his own affidavit in which he says that he asked Attorney Moore prior to his change of plea hearing to obtain evidence of his "mental state" in order to obtain a downward departure under the Sentencing Guidelines.[15]

---

[14] Doc. 498-2
[15] Doc. 498-4

5

In his reply to the government's response,[16] he states that in 1993 and 1994 he was receiving social security disability checks for mental disabilities, and at that time had been diagnosed as a paranoid schizophrenic and manic depressive.[17] He attached to his reply a "Psychiatric Consultation" from Tacoma Adventist Hospital dated July 27, 2005, which recites that Petitioner claimed to be hearing voices and that he was sleeping poorly. The examining psychiatrist, Dr. Diebolt, diagnosed schizophrenia, paranoid type 295.3, and prescribed Haldol.[18]

Based on the above, Petitioner argues that if the Court had been aware of his mental issues, he would not have been held to the same standard as a "normal person,"[19] and that he could have been found not guilty or at least have benefited from a downward departure because of lessened culpability. He flatly asserts that he was insane when he made threats to have a co-defendant, Michael Brobeck, killed.

There is a huge amount of evidence in this court record, the bulk of it from Petitioner himself, that contradicts Petitioner's belated assertion that he was insane. First, at his initial appearance on January 27, 2009, the Magistrate Judge asked him if he had *ever* had any kind of mental or psychological problem that could interfere with his ability to understand these proceedings. Petitioner answered, "no."[20]

---

[16] Doc. 505
[17] Doc. 505, p. 2
[18] Doc. 505-1
[19] Doc. 505, p. 32
[20] Transcript of initial appearance and arraignment, Doc. 476, p. 7

6

On July 17, 2009, at which time Petitioner was in pretrial detention, Attorney Moore filed a "motion for medical care,"[21] in which he requested that Mr. Campos be transferred to a Bureau of Prisons' medical facility for medical treatment and "care pre-trial." Attorney Moore listed the reasons underlying his motion: congestive heart failure, chronic obstructive pulmonary disease, hypertension, and sleep apnea. Nothing was said about mental problems. Attached to that motion was a "to whom it may concern" letter from Petitioner himself. In that letter, he mentioned the medical needs he had which were not being met by the facility in which he was then housed: three heart attacks; two heart failures; and the need for a CPAP machine for his sleep apnea. Nowhere did he mention mental problems.

At his change of plea hearing on December 15, 2009, the District Judge asked Petitioner if he was being treated, or had he been recently treated, for any kind of mental illness, to which Petitioner responded "no." The Court also asked Petitioner if he understood what was happening that morning, and Petitioner stated that he did. Additionally, the District Judge asked Petitioner's attorney if he believed that Petitioner was competent to enter a plea of guilty, and Attorney Moore said that he did.[22] The District Judge pointedly asked Petitioner if he was satisfied with his attorney's representation. Petitioner, who of course was under oath, answered that he was.[23] That answer cannot be reconciled with Petitioner's allegation that he previously had asked attorney Moore to obtain mental health records and Moore failed to do so. Later in the change of plea hearing, the District

---

[21] Doc. 132
[22] Doc. 483, pgs. 4-5
[23] Doc. 483, p. 8

7

Judge noted that he had observed Petitioner's appearance and his responsiveness to the Court's questions, and based on those observations and Petitioner's answers to the Court's questions, the District Judge found that Petitioner was "in full possession of his faculties and [was] competent to plead guilty."[24]

The presentence report says only that while Petitioner was incarcerated in Sacramento County, California, "he experienced anxiety attacks and was prescribed medicine to assist with sleeping. He reported no present issues with anxiety."[25] At the commencement of the lengthy sentencing hearing on March 28, 2011, the District Judge asked Petitioner if he had reviewed the presentence report, and he answered that he had.[26]

Thereafter, Petitioner had an extended colloquy with the District Judge, and not once did he say anything about mental health problems. During that entire hearing, Petitioner talked about his various physical health problems, but never did he mention any mental problems. He mentioned Tacoma Adventist Hospital on one occasion, but only with respect to his cardiologist.[27] To repeat, Petitioner referred to his poor health many times, but never mentioned *mental* health problems.

At the second sentencing hearing on October 27, 2011, the District Judge asked Petitioner if he wanted to add anything to what he said at the first

---

[24] Doc. 483, p. 27
[25] PSR ¶ 120, p. 23
[26] Doc. 468, p. 5
[27] Doc. 468, p.104

8

sentencing hearing in March.[28] Petitioner spoke to the Court but, once again, said nothing about mental health problems.

On August 6, 2014, Petitioner wrote a letter to the District Judge regarding the presentence report. That letter says:

> The reason of this letter is to let you know that when
> I saw the PSI Lady…I told her that I have mental
> problems and that I received since 1991 SSI and Social
> Security for my medical disability.
> I also told her that I was having problems and not been seen
> by a psychology [sic] at the jail or been giving [sic] any
> medication.
> When I received the PSI I contact my attorney Mr. Tim Moore
> office and I spoke to his investigator Mr. Hatcher and I [told] him
> that in the PSI [nothing was said] about my medical problems.[29]

He wrote another and more recent letter of similar import on April 24, 2015, in which he again says the PSI report omitted any information about his mental problem notwithstanding he told the probation officer about it.[30]

The government filed its response to the § 2255 motion on May 10, 2013, pointing out in that response that any reference to mental illness was "conspicuously absent from the PSI report, although Petitioner had the opportunity to inform the probation office directly about any such mental illness."[31] Fifteen months later, in his letter to the Court, Petitioner claimed for the first time that the Court's probation officer negligently failed to incorporate into the report information he had communicated to her about his mental illness. And lest it be forgotten, the Court pointedly asked Petitioner at his sentencing hearing if he had reviewed the PSI report, and he answered that he had. If the mental history section of the report omitted critical information, Petitioner

---

[28] Doc. 484, p. 6 *et seq.*
[29] Doc. 516
[30] Doc. 523
[31] Doc. 500, p. 10

9

reasonably would have said so. He did not. The timing of these letters, coupled with his failure to say anything to the District Judge when he had the opportunity to do so, negates any slight probative value they otherwise might have. They are a patent and rather shallow attempt to explain the absence of any mention in the PSI report of a mental problem.

In his reply/traverse, he says that his drug usage was an attempt to self-medicate his mental problems, that he became addicted as a result, and he committed crimes to obtain money with which to buy drugs.[32] Yet in the October 2015 sentencing hearing, he blamed his drug addiction on being prescribed opioid painkillers in California in the year 2000.[33]

Lastly, the 2005 psychiatric consultative report of Dr. Diebolt, when read in its entirety, shows that Petitioner's mental problems were rather insignificant when compared to what this Court has seen over the years, and continues to see. Certainly his mental problems were no more serious than many others who have appeared before this Court. Although Petitioner reported that he was hearing voices (a classic symptom of schizophrenia), Dr. Diebolt noted that Petitioner's Affect was normal; his Thought Process was logical; his Associations were intact; his Thought Content was relevant, and any mention of delusions, hallucinations, suicidal ideation, and feelings of hopelessness and helplessness were notably absent; his Level of Consciousness was "alert;" his Language was "intact;" his Fund of Knowledge was fair; his Intellect was below average; his Insight was fair;

---

[32] Doc. 505, pp. 2-4
[33] Doc. 484, p. 8

10

and his Judgement was "poor." [34] No restrictions or concerns were noted; Dr. Diebolt prescribed Haldol and sent Petitioner on his way.

U.S.S.G. § 5H1.3 states that a mental or emotional condition may warrant a downward departure if the condition is "present to an unusual degree and distinguishes the case from the typical case covered by the Guidelines." If everything Petitioner alleges is accepted as true, his condition was not present to an unusual degree, nor could it have been distinguishable from the typical case covered by the guidelines.

The record of the numerous hearings in this case clearly demonstrates that Petitioner's allegations of insanity or significant mental illness are incredible and unbelievable. Even if Attorney Moore failed to obtain mental health records as Petitioner claims, the outcome of this case would have been the same.

4. *Did Petitioner's Attorney render ineffective assistance by failing to argue against the application of the three-level enhancement for being in a managerial role in the conspiracy?*

Notwithstanding how Petitioner entitled this ground, he only argues that he merely sold cocaine; that he exercised no managerial role in the conspiracy; and that the three-level enhancement was therefore improper. He actually says nothing about his attorney's failure to argue the inappropriateness of the enhancement. In any event, his attorney did object to the presentence report in this respect, as the addendum to the presentence report clearly shows. See also the Affidavit of Attorney Moore's investigator, Mr. Brian Hackett, which disputes the

---

[34] A "below average" intellect and "poor judgement" do not make Petitioner unique as far as the average defendant in this Court is concerned.

11

assertion that Petitioner had a managerial role in the conspiracy.[35] Moreover, Attorney Moore vigorously argued during Petitioner's sentencing hearing that there was no basis to increase Petitioner's offense level for having a managerial role in the conspiracy.[36]

Contrary to Petitioner's allegation, Attorney Moore objected several times to the three-level enhancement. This ground is factually baseless.

5. *Is Petitioner's 1994 California conviction invalid due to his then-attorney's failure to advise him he could be deported as a result of that conviction?*

As noted earlier, this issue was raised in Petitioner's "motion to supplement" his § 2255 motion [Doc. 534]. For several reasons, this argument has no merit.

Petitioner is a Cuban national. He says that his California lawyer did not warn him that the conviction which would follow his plea of guilty to the crack cocaine charge in 1994 could result in his deportation from the United States.

*Padilla v. Kentucky*, 559 U.S. 356 (2010) holds that a lawyer is required to warn an alien defendant that a conviction may result in deportation, and the failure of a lawyer to do so constitutes ineffective representation. *Padilla*, however, was held to be inapplicable to convictions which were final before *Padilla* was decided, *Chaidez v. U.S.*, 133 S. Ct. 1103 (2013). Since Petitioner's conviction was in 1994 and *Padilla* decided in 2010, *Padilla* is of no use to him. But Petitioner relies upon two cases from the Ninth Circuit to support his argument that his 1994 conviction is nevertheless invalid. In *United States v.*

---

[35] Doc. 409
[36] Transcript of Sentencing Hearing, Doc. 468, pgs.69, et seq.

*Kwan*, 407 F.3d 1005 (9th Cir. 2005), the Ninth Circuit utilized the extremely rare writ of *coram nobis* [37] to invalidate the Petitioner's twenty-year old conviction because his lawyer had *affirmatively* (and erroneously) told him that it was very unlikely that he would be deported if he pled guilty. In *United States v. Chan*, 792 F.3d 1151 (9th Cir. 2015), the Court applied *Kwan* retroactively to set aside a twenty-year old conviction, again using the writ of *coram nobis*. As in *Kwan*, the Petitioner in *Chan* claimed that her attorney affirmatively misled her regarding the effect of a guilty plea on her immigration status. [38]

First, Petitioner filed this claim two and half-years after he filed the §2255 motion and, contrary to what he says in the "supplement," it in no way relates back to his various claims against Attorney Moore in this Court. The two claims are utterly unrelated, from which it follows that this particular issue or claim is barred by 28 U.S.C. § 2255(f).

Second, to the extent that Petitioner may be arguing that this Court should utilize the writ of *coram nobis* to invalidate the 1994 California conviction, this Court has no jurisdiction to do so; a writ of *coram nobis* may issue only from the court in which the error occurred, *U.S. v. Sandles*, 469 F.3d 508, 517 (6th Cir. 2006).

Third, Petitioner's request that this or some other court use *coram nobis* to declare his 1994 conviction invalid is barred by laches. The equitable doctrine of laches is applicable to petitions for the writ of *coram nobis*; *see, e.g.*, *Blanton v.*

---

[37] "It is difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." *U.S. v. Smith*, 331 U.S. at 475, n. 4.

[38] Here, Petitioner does not claim that his California attorney *affirmatively* misled him; whether that would make a difference to the Ninth Circuit is irrelevant as far as the case before this Court is concerned.

*United States,* 94 F.3d 227 (6th Cir.1996). In his "supplement," Petitioner recites that after his served his three-year sentence in a California state prison, he "was transferred to an immigration facility in San Pedro, California to face the consequences of deportation…."[39] Assuming that Petitioner's 1994 California attorney failed to tell him that he could be deported after his drug conviction, that oversight was neutralized when Petitioner was transferred to the deportation facility after he was released from prison. By his own admission, Petitioner has known for at least eighteen years that he could be deported on account of his 1994 conviction, and for those eighteen years he has failed to seek any relief. After this length of time, it would be impossible to re-try petitioner for that offense in the event the conviction was set aside; clearly, the State of California would be prejudiced due to Petitioner's inexcusable delay.

Petitioner's California convictions have been final for over twenty years, and as this is written they remain valid. His argument is baseless.

**III. CONCLUSION AND RECOMMENDATION**

None of Petitioner's claims have merit. Therefore, it is respectfully recommended that Petitioner's original motion, doc. 498, and the supplement thereto, doc. 534, both be denied.[40]

Respectfully submitted:

s/ Dennis H. Inman
UNITED STATES MAGISTRATE JUDGE

---

[39] Doc. 534, p. 3.
[40] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C.§ 636(b)(1).

14